CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 18 2011

JULIA C. DOOLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ALIREZA ALAMJAMILI,          )
                             )
          Plaintiff,         )        Civil Action No. 7:09-cv-213
                             )
v.                           )        **MEMORANDUM OPINION**
                             )
BERGLUND CHEVROLET, INC.,    )        By: Hon. Glen E. Conrad
                             )        Chief United States District Judge
          Defendant.         )

Alireza Alamjamili claims in this suit that, in violation of Title VII of the 1964 Civil

Rights Act ("Title VII"), he was discriminated against on the basis of his national origin during

and up to the conclusion of his employment with the defendant, Berglund Chevrolet

("Berglund"). The case is now before the court on four motions: Berglund's motion for summary

judgment, Berglund's motion to amend its complaint to state an additional affirmative defense,

Berglund's motion to strike a post-hearing affidavit offered by Alamjamili, and Alamjamili's

motion to strike an affidavit attached to Berglund's motion for summary judgment. The court's

resolution of each of these motions is detailed below.

## I.    **Factual and Procedural Background**

The following facts are stated in the light most favorable to the plaintiff. Terry's Floor

Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

The defendant, Berglund Chevrolet, is a Roanoke-area car dealership. Bruce Farrell is its

Chief Executive Officer and principal owner; his son, William Farrell, is its President. William

Farrell previously managed a separate South Carolina dealership owned by the Farrells, but

moved to Roanoke to take over management of Berglund in the summer of 2006. Since William

Farrell's arrival, Bruce Farrell has directly supervised only William Farrell, while William Farrell oversees the daily operations of the business. (B. Farrell Dep. at 10.)

The plaintiff, Alireza Alamjamili, is Iranian-American. Due to his friendship with Dave Sarmadi, an Iranian-American who was working as the General Manager of Berglund, Alamjamili was hired by Berglund as a salesperson in July 1996. He was promoted in February 2001 to the position of Finance and Insurance ("F&I") Manager in the sales department, where he remained until the termination of his employment in 2006. His direct supervisors during the time relevant to this case were Paul Reburn (Berglund's F&I Director), Bill Crick (Berglund's General Manager in October 2005), and Jerry Huneycutt (the General Manager in October 2006).

Berglund concurs with Alamjamili that he was generally an excellent employee. (B. Farrell Dep. at 24; W. Farrell Dep. at 14.) Alamjamili recounts that he made very good money as an F&I Manager but that, especially after September 11, 2001, he experienced "constant" ethnic epithets from colleagues and from a few supervisors, including Reburn. Several colleagues frequently referred to him as "Chemical Ali," "Camel Jockey," "Little Terrorist," or "Little Mexican," while others asked him questions such as where he had parked his camel. (Alamjamili Dep. at 153-163.) When Alamjamili complained to his direct supervisors about the comments, they told him that his colleagues and supervisors were just joking around and that they didn't want to hear about it.

Berglund has a "No Harrassment Policy" in place, which directs that employees must immediately direct complaints of harassment to either Bruce Farrell or Anne Feazelle, his assistant. (Docket No. 69-1 at 51.) Alamjamili received a copy of the policy when he was hired, but never complained about the harassment he allegedly endured to either of the persons

identified in the policy. It is uncontested that, prior to October of 2006, neither Bruce Farrell nor William Farrell ever made any ethnically-charged comments to Alamjamili or took any ethnically-motivated action against him.

According to Alamjamili, this changed in 2006 when Berglund began investigating a transaction that had caused it to lose more than $16,000. The transaction involved an October 17, 2005, sale of a used Dodge Neon for which Alamjamili had served as the F&I Manager. The parties dispute the precise responsibilities and authority held by F&I Managers at Berglund, but, construing all reasonable inferences in Alamjamili's favor, it appears that an F&I Manager's role at Berglund is essentially as follows: after a salesperson makes a sale to a customer, the customer meets with an F&I Manager, who prepares and sells warranties and financing products to the customer. After completing his portion of the sale, the F&I Manager prepares the relevant financing documents as well as at least two internal documents that are attached to Berglund's internal file for the deal: the Delivery Check List and the Delivery Notes. The Delivery Check List essentially ensures that each Berglund employee involved in the sale had performed all required tasks; it requires that the sales manager, the F&I Manager, and the title clerk each sign off that their tasks with respect to the deal have been appropriately accomplished. (Docket No. 77-1 at 26.) The Delivery Notes document allows employees involved in the deal to note whether to hold the delivery of the automobile pending insurance or credit approval, to instruct what type of registration will be issued, and to detail the lender name and terms of any applicable financing. (Docket No. 77-1 at 34.) It also leaves a space for the entry of "Other comments/instructions." Id. After completing these internal documents, the F&I Manager forwards the deal folder to the sales manager of the relevant sales department and to the title clerk for further processing of the deal.

3

According to Alamjamili, the Neon involved in the 2005 transaction had been purchased by Berglund at auction for $8,945. Internal documents allegedly reveal that Berglund had a target sale price of $11,990. (Docket No. 77-1 at 27.) On October 17, 2005, however, the sales team did even better than that: a West Virginia couple agreed to purchase the Neon for $12,990. As the F&I Manager on the deal, Alamjamili sold the couple several financial products, including a warranty and a financing package for the entire purchase price, resulting in a total financed amount of over $15,000. (Docket No. 77-1 at 24-25.) Due to the couple's credit history, the annual interest rate on the loan was 19.15%, resulting in a total cost to the couple of $26,336.16 at the end of the loan's 72-month term. Id.

Two unusual things occurred with respect to this transaction. First, Alamjamili did not collect the applicable taxes and fees directly from the customer, nor did he include them in the amount financed. Berglund claims that it is its regular business practice to do so and that Alamjamili's failure to collect the applicable taxes and fees therefore deviated from the norm. Alamjamili agrees that his conduct with respect to this transaction was unusual, but claims that he was told by one of his supervisors—either Bill Crick or Paul Reburn—not to collect taxes on this particular deal. According to Alamjamili, he had been instructed—albeit infrequently—to do likewise on some of the deals he had processed in previous years. With respect to this particular transaction, Alamjamili hypothesizes that he was told not to collect the applicable taxes in order to maximize Berglund's profit on the deal. Alamjamili theorizes that the bank would not approve more than a $13,000 overall purchase price, and that the dealership therefore structured the deal so that the $12,990 sale price was simply the price of the car. That way, the customer would be responsible for paying the taxes on the purchase price directly to the Department of Motor

4

Vehicles (the "DMV"), while the dealership would keep the entire net profit on the sale rather than carving out a portion of it to pay taxes on behalf of the customer. In any event, Alamjamili contends that he filled out the Delivery Notes document to reflect this instruction from his superior by making two notations in the "Other comments/instructions" field: (1) "W[est] V[irginia] customer"; and (2) "Customer will do his own DMV work." (Docket No. 77-1 at 34.) Alamjamili then forwarded the file, including the Delivery Notes and Delivery Check List, to the used car sales manager (Woody Smith) and Berglund's title clerk (Heather King) for further processing.

Both parties assume that the second unusual occurrence in this transaction is causally-linked to the first, although their apportionment of ultimate responsibility for it differs widely. The second aberration is that Heather King, the title clerk, sent the vehicle title directly to the West Virginia customers instead of to the lender. Of course, it is the policy of Berglund that, when a vehicle is financed through a lender, the title must be sent to the lender rather than the customer in order to ensure that the title is submitted to the DMV in order that the lender's lien be properly perfected. Nevertheless, King claims that she believed she was instructed to send the title to the customer by Alamjamili's notation on the Delivery Notes ("Customer will do his own DMV work."). She also claims that she called Alamjamili to ascertain that the customer would do his own DMV work, and that Alamjamili responded in the affirmative. Alamjamili, on the other hand, maintains that F&I Managers have no authority to tell the title clerk what to do with the title, and nor, in any event, was his notation an instruction to do anything with the title at all, being merely a reminder that the customer would pay his own taxes directly to the DMV. Alamjamili also contends that "everyone" at Berglund knew that King—rather than

5

Alamjamili—was responsible for the erroneous mailing and that King herself had later told Alamjamili, "I messed up. I should have known better [than] to send the title to the customer." (Alamjamili Dep. at 110.)[1]

Unfortunately, the West Virginia couple did not file the title with the DMV, and the lender subsequently notified Berglund that the lien on the vehicle had not been properly perfected due to Berglund's erroneous mailing. The Farrells were apprised of the situation in September of 2006, when the lender demanded that Berglund pay to it the $16,417.09 balance on the loan represented by the unperfected lien.

The Farrells contend that they immediately decided that whoever was responsible for the loss would be required to pay it back to the company in full, in accordance with a company-wide policy that required employees who had caused losses to sign promissory notes guaranteeing that they would pay Berglund the full amount of losses they had caused. Alamjamili, on the other hand, claims that, prior to William Farrell's arrival in 2006, two previous managers had put in place a policy that employees would be required to pay back only 10% of any loss they caused Berglund to suffer. Although both sides claim their respective policies are entrenched in Berglund's corporate history, neither of them appear to be evidenced anywhere in writing. While Berglund does have a written policy directing procedure in "occasions . . . where it is advisable to make an official recording of a debt owed to the company by an employee," the policy nowhere states that the employee must repay 100% of any losses they have caused the company. (Docket No. 69-8 at 14-15.) Still, Alamjamili does not expressly claim that William Farrell was aware of

---

[1] In her deposition, King appeared to also admit to telling other people that she made a mistake with respect to the paperwork. Given her immediately subsequent testimony, however, it is not entirely clear that she properly understood the question. (King Dep. at 28.)

the 10% policy that had been adopted by the previous managers; in fact, he admits that William Farrell told him in October that he had never heard of the 10% policy. (Alamjamili Dep. at 204.)

After determining that Alamjamili had served as the F&I Manager on the problematic transaction, William Farrell informed Alamjamili about the transaction's troubled history on Friday, October 13, 2006. Alamjamili denied responsibility, claiming that either Reburn or Crick had told him not to collect taxes on the deal, that the used car sales manager had signed off on the deal after reviewing the documentation, and that Alamjamili had not directed King to send the title to the customer nor did he have any authority to do so. (Alamjamili Dep. at 10, 120.) According to Alamjamili, William Farrell then told him that, because there seemed to be three people involved in the error, it might be appropriate to apportion the loss amongst the three of them. (Alamjamili Dep. at 14-15.) Alamjamili told him that splitting up the loss was "his [William's] decision" and left the office. Id.

On Monday, October 16, Reburn and Huneycutt took Alamjamili into Reburn's office and told him that William Farrell wanted Alamjamili to sign a promissory note guaranteeing to pay to Berglund the entire $16,417.09 amount of its loss at an annual interest rate of 8%. Alamjamili protested, explaining that he was not at fault for the loss. He also questioned why he should be required to pay back the entire amount when several of the underlying expenses—such as the warranty—were refundable. Finally, Alamjamili took issue with the promissory note's requirement that he reimburse Berglund for the profit it had realized on the sale of the Neon.

When his supervisors reiterated that William Farrell believed he was entitled to the full amount from Alamjamili, Alamjamili suggested that they just take the sum out of his paycheck in $1000 monthly installments. They refused his offer, on the basis that William Farrell wanted

Alamjamili to sign the promissory note. They also confirmed to Alamjamili that he would still be liable for the full amount of the note even if they fired him immediately after he signed it. Alamjamili, believing that the rejection of his oral offer to pay back the sum in its entirety indicated that Berglund simply wanted to obtain his signature on the promissory note and then terminate him, refused to sign the note.

After he failed to sign the promissory note as requested, Alamjamili was fired. None of the other people involved in the botched transaction were requested to reimburse Berglund's loss, required to sign a promissory note, or disciplined in any form. At the time of his termination, Alamjamili was the only Iranian-American employed by Berglund.

After pursuing administrative remedies, Alamjamili filed this suit on May 29, 2009, alleging, essentially, that he suffered disparate treatment, retaliation, and a hostile work environment on the basis of his national origin, in violation of Title VII. After the conclusion of discovery, Berglund moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.     Berglund's Motion for Summary Judgment

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination,

8

"the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, however, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To forestall summary judgment, the nonmoving party must set forth more than a "mere . . . scintilla of evidence." Anderson, 477 U.S. at 252. At the very least, the nonmoving party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)). See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (party opposing summary judgment must do more than show that there is some "metaphysical doubt" as to the material facts).

A. **Disparate Treatment Claim**

The first claim asserted by Alamjamili is that he was subjected to disparate treatment on the basis of his national origin. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

"Under Title VII, the plaintiff bears the initial burden of proving a prima facie case of discrimination by raising an inference that the defendant acted with discriminatory intent."

9

Karpel v. Inova Health System Services, 134 F.3d 1222, 1227 (4th Cir. 1998). This can be accomplished either through direct evidence of discriminatory intent, or by raising an inference of discriminatory intent via the four-part burden-shifting scheme explicated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004).

### 1.    Prima Facie Case of Discrimination

Alamjamili does not pursue any argument that there is direct evidence of disparate treatment other than a flat citation to Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Instead, his argument that "the direct and circumstantial evidence is more than sufficient to overcome summary judgment" appears to rely primarily on the McDonnell Douglas shifting burden scheme. (Pl. Br. at 38.)[2] "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). See also E.E.O.C. v. Sears Roebuck and Co., 243 F.3d 846, 850 (4th Cir. 2001) (national origin discrimination).

The parties' dispute with respect to the prima facie case revolves primarily around their differing conceptions of which "adverse" employment action should be focused on—a difference which translates into a disagreement over which other employees should be scrutinized when inquiring whether any of them were "similarly situated" to Alamjamili. Coleman, 626 F.3d at

---

[2]Although Berglund has characterized Alamjamili's brief as abandoning the McDonnell Douglas proof scheme, it appears otherwise. See Pl. Br. at 37.

190. Berglund focuses on the "adverse" action of conditioning Alamjamili's job upon his signing of the promissory note. Because it focuses on Alamjamili's circumstances at the time of this employment action, Berglund observes that Alamjamili was at that point in time considered by the company to have caused a loss of over $16,000. Berglund claims that several other non-Iranian-American employees who caused losses to the company were required to sign promissory notes for the losses they had caused, under the same or similar terms as imposed on Alamjamili. (Docket No. 69-8 at 19-45.) Nor has Alamjamili identified any non-Iranian-American who committed similar errors but was not required to fully reimburse Berglund for the loss. Compare Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 297 (4th Cir. 2010) (doubting the defendant's reliance on a policy in light of "evidence suggesting that the policy does not exist or, alternatively, that it was erratically implemented."). Moreover, Alamjamili had himself twice signed similar promissory notes—one in connection with extra lodging costs he had incurred on a business trip (February 6, 2001; $741.50), and one in connection with his involvement in an accident while driving a company car (February 7, 2001; $2,205.51).

Alamjamili, on the other hand, chooses a different locus of adversity: the initial investigation and assignment of blame itself. In other words, Alamjamili claims that, even though he was just as innocent as any other employee—especially the title clerk and the used car sales manager—William Farrell singled him out as the focus of the investigation and pinned the blame solely on him rather than on any of the other equally-culpable or even more-culpable parties. (Alamjamili Dep. at 253.) In short, Alamjamili claims that he was scapegoated: William Farrell determined to make someone cover the $16,000 loss, and decided—for no legitimate

reason—that it would be Alamjamili instead of his supervisor, the used car sales manager, or the title clerk. None of these colleagues were Iranian-American.

Berglund, of course, argues that Alamjamili cannot be similarly situated to the title clerk, his supervisor, or the used car sales manager, because he was actually responsible for ensuring that the title paperwork was filled out correctly, whereas they were not. This argument, however, rests upon a factual dispute between the parties over the precise allocation of responsibilities between F&I Managers, the title clerk, and the used car sales manager. On summary judgment, the court must view this factual dispute in favor of Alamjamili and assume that he is either equally or less responsible for the error than his non-Iranian-American colleagues. Shaw, 13 F.3d at 798. The court must therefore conclude that Alamjamili has demonstrated a prima facie case of discrimination on the basis of ethnic origin.

### 2. Legitimate Non-discriminatory Reason

The second prong of the McDonnell Douglas test imposes upon a defendant only a burden of production; it need not prove the credibility of its stated motivation, but must only produce "reasons for [its] actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (emphasis in original).

Berglund explains that the real reason for forcing Alamjamili to sign a promissory note (or for finding that he was responsible for the loss of the company) was that he was, in fact, responsible for the loss, and that company policy required him to pay back the loan in full pursuant to a promissory note or be fired.

### 3.     **Pretext**

Alamjamili argues that Berglund's stated reason for its treatment of him is pretextual. "The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." Merritt, 601 F.3d at 294 (4th Cir. 2010) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). To forestall summary judgment, Alamjamili must make some showing that Berglund's stated explanation for its conduct toward him is "unworthy of credence." Burdine, 450 U.S. at 256.

As an initial matter, Berglund observes that Alamjamili's claims revolve solely around William Farrell, claiming that he possessed ultimate responsibility for the decisions made with respect to Alamjamili's employment. Berglund disputes this assertion, claiming that Bruce Farrell, not William Farrell, was the ultimate decision-maker who made the determination to seek repayment from Alamjamili. But again, inasmuch as the question of who was actually responsible for pinning the blame on Alamjamili and then firing him is an issue of fact, Berglund's vociferations on these grounds cannot serve as bases for summary judgment. Shaw, 13 F.3d at 798.

Berglund's more significant argument is that Alamjamili has failed to sufficiently show that William Farrell possessed an impermissible bias against Iranian-Americans or that any such bias motivated his conduct toward Alamjamili. On this score, the court must agree with Berglund. Even taking all factual conflicts in a light most favorable to Alamjamili, it is clear that he has failed to gather sufficient evidence proving "both that the reason [offered by the employer] was false, and that discrimination was the real reason."Adams v. The Trustees Of The Univ. Of

N.C. Wilmington, --- F.3d ----, 2011 WL 1289054, at *8 (4th Cir. April 6, 2011) (slip op.) (emphasis in original) (quoting Jiminez v. Mary Washington Coll., 57 F.3d 369, 378 (4th Cir.1995)).

This is true for several reasons. First, the caselaw is clear that Alamjamili's actual innocence with respect to the bolluxed transaction doesn't create a claim for discrimination. Under Title VII, an employer is liable only for discriminating on the grounds enumerated in the statute; thus, "ultimately, it is the perception of the decisionmaker which is relevant." Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007). In other words, if William Farrell actually believed—even if erroneously or unwisely—that Alamjamili was solely responsible for the loss and acted on that principle, then Title VII was not violated. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason."). A faulty or mistaken or incorrect investigation does not demonstrate that the employment decision was made on an impermissible basis; it proves only that it was made on an incorrect one. See Bonds v. Leavitt, 629 F.3d 369, 368 (4th Cir. 2011) ("Even if these investigations were improper or substandard, that does little to help her establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that her race or gender was the real reason for her termination.").

Alamjamili attempts to surmount this difficulty by arguing that William Farrell could not have possibly believed on the evidence before him that Alamjamili was solely responsible for the loss. Alamjamili points to the testimony of several colleagues and prior general managers, each of whom claim that F&I Managers at Berglund do not have the authority to direct the title clerk

14

to take any action with respect to the title and that the error could therefore not be attributable to Alamjamili. (Sarmadi Dep. at 18-19; Jones Decl. at ¶ 4; Hogan Decl. at ¶ 8.) As a result, asserts Alamjamili, William Farrell's decision to fix the blame on Alamjamili must have been motivated by something other than a good-faith determination of guilt, given the circumstances. See Merritt, 601 F.3d at 296-98 (selective application of otherwise-neutral evaluatory test was evidence of pretext); Silverman v. Board of Educ. of City of Chicago, --- F.3d ----, 2011 WL 941518, at *7 (7th Cir. Mar. 21, 2011) (slip op.) ("[A]n employer's negative evaluation of the plaintiff's performance is not always the last word. If the plaintiff can raise a genuine issue about the honesty, not merely the accuracy, of the employer's stated evaluation, the case may need to be tried.") (citation omitted).

But, even assuming that Alamjamili can cast doubt on the validity of William Farrell's evaluation of the circumstances before him, he must also prove that illegal discrimination was the "real reason" motivating William Farrell's decisions. Adams, --- F.3d at ___, 2011 WL 1289054, at *8. This, on the evidence before the court, Alamjamili simply cannot do.

Although Alamjamili insists that the evidence shows that William Farrell "does not like Iranian-American[s]," see Alamjamili Dep. at 151, his "own naked opinion, without more" is not enough to withstand summary judgment on this issue. Goldberg v. B. Green and Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988). See also Mills v. First Fed. Sav. & Loan Ass'n of Belvidere, 83 F.3d 833, 841-42 (7th Cir. 1996) ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.") (quoting Visser v. Packer Eng'g Assocs., 924 F.2d 655, 659 (7th Cir. 1991)).

15

Sidestepping this shortfall of direct proof, Alamjamili instead posits that he has elicited enough circumstantial evidence of William Farrell's discriminatory animus to forestall summary judgment. In this respect, Alamjamili leans heavily upon the Fourth Circuit's recent decision in Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 297 (4th Cir. 2010). In Merritt, the Court held that a decision-maker's selective application of a neutral policy to the plaintiff against the backdrop of a pervasively-discriminatory workplace attitude constituted the requisite nexus linking the workplace attitude with the plaintiff's ultimate termination. Id. at 300. The Court cautioned that

> It is regrettable that any distasteful comments will arise in the workplace, but that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced.

Id. Nevertheless, citing the fact that defendant's employees of all rank seemed to share the same discriminatory views such that the defendant's "corporate culture evinced a very specific yet pervasive" discriminatory attitude, the Court rejected the defendant's argument that the plaintiff had failed to elicit sufficient circumstantial evidence from which to infer invidious intent on the part of the decisionmaker. Id.

Under Merritt, Alamjamili argues that William Farrell's discriminatory animus can be inferred from the context of a workplace that was rife with discrimination against Iranian-Americans. Unfortunately for Alamjamili, the court cannot agree.

A review of the evidence put forward by Alamjamili reveals why this is so. According to Alamjamili, William Farrell's ethnically-discriminatory animus is demonstrated by his selective assignment of blame to Alamjamili in light of the background cacophony of his co-workers'

ethnically-charged comments, as well as Berglund's pattern of terminating Iranian-American employees. With respect to this latter pattern, Alamjamili highlights the experiences of two upper-level Iranian-American managers, Dave Sarmadi and Khalil Pezeshcan, both of whom were terminated from Berglund before Alamjamili was.

There are several difficulties with this argument. First, William Farrell began working at Berglund in the summer of 2006—only a few months before Alamjamili was investigated and terminated in October of that year. Nevertheless, there is no dispute that Sarmadi and Pezeshcan were forced out or demoted by Bruce Farrell long before William Farrell arrived as president in 2006. (B. Farrell Dep. at 18-19; Pezeshcan Dep. at 17.) Significantly, Alamjamili concedes that Bruce Farrell harbored no discriminatory intent toward Iranian-Americans. (Alamjamili Dep. at 152.) The corollary is clear: on Alamjamili's own admission, the conduct of William Farrell's concededly unprejudiced predecessor with respect to Sarmadi and Pezeshcan was not the product of prejudice. Thus, the pre-2006 treatment of Sarmadi and Pezeshcan not only demonstrates nothing about William Farrell's discriminatory animus, but it utterly fails to support a theory that Berglund's corporate culture was infected by bias at the time William Farrell joined it. See also Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 519 (4th Cir. 2006).

Second, the fact that Berglund was headed by an indisputably unprejudiced party until only a few months prior to Alamjamili's termination significantly undercuts Alamjamili's claim that Berglund harbored a long-standing corporate culture of pervasive detestation toward Iranian-Americans. This weakness in Alamjamili's "corporate culture" argument is emphasized when coupled with the background principle that a discriminatory statement generally establishes the existence of a discriminatory workplace atmosphere only when it "is not an off-hand comment by

17

a low-level supervisor but a remark by a senior official evidencing managerial policy."

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 356 (6th Cir. 1998). Cf. Merritt, 601

F.3d at 300; Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 132 (3d Cir. 1997) (a court

determining whether an executive's comment circumstantially proves discriminatory animus

must "evaluate factors pertaining to the declarant's involvement in recognizing a formal or

informal managerial attitude, including the declarant's position in the corporate hierarchy . . ."); 

Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641 (3d Cir. 1993) (sufficient

circumstantial evidence of pretext when racially derogatory statements and notes were made by

managers, allowing an inference that management permitted an atmosphere of racial prejudice to

infect the workplace). As a result, the fact that most of the comments identified by Alamjamili

emanated from non-supervisory colleagues weighs against a finding that William Farrell's

discriminatory intent can be inferred sheerly on the basis of opinions voiced by his underlings.

See also Young v. United Parcel Service, Inc., 2011 WL 665321, at *11 (D. Md. Feb. 14, 2011)

(slip op.) (distinguishing Merritt where the case involved an isolated comment and no evidence

of a corporate culture permeated with impermissible discrimination).

Third, Alamjamili has failed to produce any evidence suggesting that William Farrell

knew and tacitly approved of whatever ethnic distaste may have existed at Berglund. Again,

William Farrell had been employed at Berglund for only a few months prior to Alamjamili's

termination. There is no evidence that William Farrell made any ethnically-charged comments

about Alamjamili or any other Berglund employee. See E.E.O.C. v. Clay Printing Co., 955 F.2d

936, 942 (4th Cir. 1992) (finding no nexus between discriminatory statements of decisionmakers

and termination of plaintiffs where statements were not directed at any of the plaintiffs or toward

any particular employment decision). Nor has Alamjamili ever claimed that William Farrell knew about the derisive and ethnically-charged comments made by Alamjamili's co-workers or that they factored into the decisions that he made with respect to Alamjamili. See Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.") (internal quotation marks and alteration omitted), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). In fact, Alamjamili does not dispute that Berglund hired at least two Iranian-Americans after his termination. Nor does the fact that Pezeshcan allegedly experienced ethnically-based derision at the hands of co-workers when he was rehired after Alamjamili's termination shed any light on William Farrell's motivations with respect to his interactions with Alamjamili, which had occurred years earlier.

The court recognizes that Alamjamili need not produce a smoking gun; that, "at some point," William Farrell's workplace environment puts his arguably selective allocation of blame upon Alamjamili "in a less neutral context." Merritt, 601 F.3d at 300. But here, unlike in Merritt, the evidence of a long-standing culture of discrimination is decidedly less than "pervasive." Id. Alamjamili has admitted that Bruce Farrell, William Farrell's immediate predecessor and superior, held no prejudice whatsoever. And in the absence of any evidence that, in the brief amount of time that had elapsed since he took over Berglund's daily operations, William Farrell soaked up or contributed to or tacitly approved of a pervasively-discriminatory corporate culture, the deplorable remarks of Alamjamili's co-workers are simply insufficient to establish pretext. Accord Mlynczak v. Bodman, 442 F.3d 1050, 1057 (7th Cir. 2006); Mondero v. Salt River

Project, 400 F.3d 1207, 1213 (9th Cir. 2005); Foster v. New Castle Area School Dist., 98 F.

App'x 85, 88 (3d Cir. 2004) (unpublished); Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521

(3d Cir. 1997); Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 779 (8th Cir. 1995) (no nexus

where statements were made by nondecisionmakers and no evidence demonstrated that the

decisionmaker considered the statements in his decision); Bevan v. Honeywell, Inc., 118 F.3d

603, 610 (8th Cir. 1997); Brewer v. Quaker State Oil Refining Corporation, 72 F.3d 326, 333 (3d

Cir. 1995); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 547 (3d Cir. 1992);

McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 687 (7th Cir. 1991) (even deplorable

comments "are of marginal relevance to a Title VII inquiry" if they are made by non-decision-

makers).[3]

    Accordingly, the court cannot conclude that the evidence gathered by Alamjamili creates

a "clear nexus" between William Farrell's decision-making process and the discriminatory acts

perpetrated by others at Berglund. Merritt, 601 F.3d at 300. Indeed, Alamjamili has not even

been able to show that William Farrell knew that anti-Iranian-American bias existed at Berglund.

Because his evidence fails to bridge this gap, Alamjamili has failed to forecast sufficient

evidence that illegal discrimination was the "real reason" behind either of the adverse actions that

are challenged in this case: the allocation to Alamjamili of sole responsibility for the muddled

2005 transaction or his eventual termination. Adams, --- F.3d at ___, 2011 WL 1289054, at *8.

Cf. Silverman, --- F.3d at ___, 2011 WL 941518, at *7. Summary judgment must therefore be

entered on his disparate treatment claim.

---

[3] Alamjamili has made no claim that anyone other than William Farrell was responsible for or influenced his termination; thus, the Supreme Court's recent explanation of the "cat's paw" theory of liability in Staub v. Proctor Hospital, ---U.S. ----, 131 S. Ct. 1186 (2011) is inapplicable to this case.

## B. Hostile Environment Claim

Alamjamili's second claim is that he was illegally subjected to a hostile work environment. Title VII prohibits both tangible economic discrimination, <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986), and the permeation of the workplace with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993) (citing <u>Meritor Savings</u>, 477 U.S. at 67). To survive an employer's motion for summary judgment on a hostile work environment claim, a plaintiff must show that the offending conduct (1) was unwelcome, (2) was based on his ethnicity, (3) was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment, and (4) was imputable to his employer. <u>Ziskie v. Mineta</u>, 547 F.3d 220, 224 (4th Cir. 2008); <u>Ocheltree v. Scollon Productions, Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

### 1. Time Bar

Berglund first argues that this claim is time-barred, given Alamjamili's inability to remember precisely when the ethnically-charged comments occurred. <u>See</u> Alamjamili Dep. at 155-56 ("Do you remember seven years ago? Six years ago?").

A thorough review of Alamjamili's deposition testimony reveals, however, that Berglund's argument must fail. Because workplace harassment is considered a continuing violation, a hostile environment claim is timely if any of the predicate facts contributing toward the continuing hostile environment occurred not more than 300 days prior to the plaintiff's filing

with the EEOC. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002); Gilliam v.

S.C. Dep't of Juvenile Justice, 474 F.3d 134, 140 (4th Cir. 2007).

In this case, Alamjamili asserted that many of the derogatory comments were made by

one of his co-workers, Johnny Flanagan, and that Flanagan made them "constantly." (Alamjamili

Dep. at 153, 155, 156.) When pressed for a more precise timeline, Alamjamili responded, "The

timeline was when we was [sic] working together as F&I in the used—in the truck department.

And we were working together next to each other." Id. at 156. Follow-up questioning led to

Alamjamili's estimate as to the dates in question: "Maybe 2004, '5, '6. . . . I don't know exactly

when, but the time we working together. That's the best answer." (Alamjamili Dep. at 157.)

Neither party disputes that Flanagan was working at Berglund until and after

Alamjamili's termination in October 2006. (Docket No. 91.)[4] Nor is there any dispute that

Alamjamili's EEOC charge was filed within 300 days of his termination. Thus, because

Alamjamili's testimony is that he endured Flanagan's verbal abuse until the day of his

termination, his hostile environment claim is timely. Gilliam, 474 F.3d at 141.

### 2.   "Severe or pervasive"

Berglund next attacks Alamjamili's claim by arguing that the conduct of which he

complains was insufficiently "severe or pervasive" to alter the conditions of his employment.

Ziskie, 547 F.3d at 224. There are "both subjective and objective components" to this element.

Hoyle v. Freightliner, LLC, --- F.3d ----, 2011 WL 1206658, at *8 (4th Cir. April 1, 2011)

(quoting Ocheltree, 335 F.3d at 333). Not only must the workplace environment be perceived by

---

[4]Defendant's motion to strike Alamjamili's affidavit (Docket No. 87) is dismissed as moot, given the
parties' stipulations to the dates of Flanagan's employment.

the victim as hostile or abusive, but that perception must also be objectively reasonable. Harris, 510 U.S. at 22. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998) (quoting Harris, 510 U.S. at 23.).

While conduct that is directly targeted at or personally experienced by the plaintiff is the evidence most relevant to this determination, "[e]vidence of a general atmosphere of hostility" toward those with the plaintiff's characteristics is considered in the examination of all the circumstances. Jennings v. University of North Carolina, 482 F.3d 686, 696 (4th Cir. 2007); Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir. 2001). Still, because Title VII is not a "general civility code," the harassing conduct "must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). As a result, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id.

In this case, the basis for Alamjamili's hostile environment claim is (a) the fact that all other Iranian-American employees were also forced out by Berglund; (b) the fact that Khalil Pezeshcan was victimized by ethnically-charged comments and favoritism when he returned to Berglund in 2008; and (c) the pervasive comments and nicknames directed at Alamjamili from several co-workers, including one of his supervisors, Paul Reburn, and several of his colleagues: Don Musgrove, Johnny Flanagan, and others. (Alamjamili Dep. at 41.) Alamjamili claims that, especially after the events of September 11, 2001, several of his colleagues constantly referred to him as "Chemical Ali," "Camel Jockey," "Little Terrorist," or "Little Mexican," while others frequently queried where he had parked his camel. (Alamjamili Dep. at 153-163.)

Although Berglund claims that these derisive epithets are insufficiently severe or pervasive, the court cannot concur. Several other courts have found that similar circumstances could support a hostile environment claim. In E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008), for example, the Court held that the plaintiff suffered severe and pervasive religious discrimination when several co-workers, including one supervisor, repeatedly called him "Taliban" and "towel head," questioned his allegiance to the United States, mocked his kufi and beard and observance of prayers, and made several anti-Muslim comments in the plaintiff's presence. Id. at 316-17. A similar result was reached in Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126 (4th Cir. 1995), where the Court held that the alleged harassment was sufficiently severe or pervasive when an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'" on an almost daily basis. Id. at 1131. Likewise, the Court in E.E.O.C. v. WC&M Enterprises, Inc., 496 F.3d 393 (5th Cir. 2007), held that the alleged harassment was severe and pervasive where the plaintiff's co-employees engaged in a "long-term pattern of riducule and repeatedly called plaintiff "Taliban" and "an Arab," told him to "go back where he came from," and stated that he was acting like a "Muslim extremist." Id. at 400-01.

Here, given that Alamjamili was allegedly subjected to these derogatory comments from numerous co-workers, including his direct supervisor, almost daily for a period of several years, the court can only conclude that he has adequately shown that the harassment he suffered was objectively severe and pervasive. See Hoyle, --- F.3d at ___, 2011 WL 1206658, at *8 (co-workers' repeated display of inappropriate pictures, sexually-suggestive swimsuit calendars, and an incident wherein a tampon was left for the plaintiff could, "in the aggregate," be determined as objectively abusive to a reasonable person in the plaintiff's position).

### 3.    Imputability to employer

Finally, Berglund claims that the harassment suffered by Alamjamili at the hands of his co-workers is not imputable to Berglund, their employer. Ziskie, 547 F.3d at 224. Inasmuch as the court has determined to grant Berglund's motion to amend its complaint[5] to state an affirmative defense under Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus. v. Ellerth, 524 U.S. 742 (1998), the court does not reach the question of imputability at this time. After engaging in any further discovery occasioned by the court's granting of Berglund's motion to amend, the parties will be permitted to file additional motions on this issue, as proves necessary.[6]

### C.    Retaliation Claim

Berglund has argued that Alamjamili has conceded any retaliation claim that he alleged in his complaint. Alamjamili has not argued otherwise or addressed the issue in his brief. The court therefore deems Berglund's assertions on this claim to be uncontested and will enter summary judgment upon it. Cf. E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 406 (4th Cir. 2005); Balazs v. Liebenthal, 32 F.3d 151, 158 (4th Cir. 1994).

---

[5]See infra Part IV.

[6]The court notes in passing that, even if the defendant's policy complies with Faragher and Ellerth, see Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999), the fate of Alamjamili's hostile environment claim is not necessarily a foregone conclusion. To the extent that William Farrell's decision to isolate Alamjamili as the sole responsible party was predicated upon information tendered to him by Alamjamili's biased co-workers, there is a colorable argument to be made that the harassment "result[ed]" in a tangible job action—namely, his ultimate termination—even though Alamjamili has made an insufficient showing from which to infer that William Farrell himself acted with discriminatory intent. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 186 (4th Cir. 2001); id. at 187 n. 10. See also Ferraro v. Kellwood Co., 440 F.3d 96, 101-02 (2d Cir. 2006); Mikels v. City of Durham, N.C., 183 F.3d 323, 331-32 (4th Cir. 1999).

**III.     Alamjamili's Motion to Strike the Affidavit of Anne Feazelle**

Alamjamili seeks to strike the declaration of Anne Feazelle, which is attached to
Berglund's motion for summary judgment. Alamjamili complains that Berglund never identified
Feazelle during discovery as "a person with knowledge of the case" and that, as a consequence,
Alamjamili never deposed her or conducted discovery with respect to her knowledge of the facts
of the case. See Hoyle, --- F.3d at ___, 2011 WL 1206658, at *5.

Despite Berglund's failure to previously disclose Feazelle as an individual with
knowledge of the matters at dispute in this action, the court concurs with Berglund that its failure
was harmless. See FED. R. CIV. P. 37(c)(1). Not only does the harassment policy—a key
document in this case—plainly identify Feazelle by name, but Feazelle's declaration is
duplicative of what Alamjamili has himself admitted: that he never complained about the
harassing comments to anyone identified by the policy as the proper recipients of such a
complaint. This is, in fact, the only assertion that Feazelle's declaration makes. As a result,
Feazelle's declaration is not only no surprise to Alamjamili, but is no harm to him, either. See
Southern States Rack And Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir.
2003). Rule 37(c)(1) therefore does not mandate that Feazelle's declaration be struck, and
Alamjamili's request that the court do so will be denied.

Nevertheless, the court deems it appropriate that, should Berglund's nondisclosure of
Feazelle result in the necessity for additional discovery, Berglund must bear any expenses and
attorney's fees incurred by Alamjamili with respect to such discovery.

## IV.    Berglund's Motion to Amend Its Answer

Berglund filed its initial answer to Alamjamili's complaint on October 5, 2009. After discovery was concluded, it moved on March 19, 2011 to amend its answer to state an affirmative defense under Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus. v. Ellerth, 524 U.S. 742 (1998), claiming that it had inadvertently failed to identify the affirmative defense in its answer earlier.

Although Federal Rule of Civil Procedure 8(c) requires that a defendant set forth affirmative defenses in its answer, it is nevertheless the case that "[a] district court is to freely grant leave to amend when justice so requires absent a compelling reason not to permit the amendment. Mere delay, when unaccompanied by actual prejudice, bad faith, or futility, does not justify a denial of leave to amend." Defender Industries, Inc. v. Northwestern Mut. Life Ins. Co., 938 F.2d 502, 508 (4th Cir. 1991) (citations and quotation marks omitted) (defendant's amendment of answer to include an additional defense after the close of evidence at trial was not unfairly prejudicial when the plaintiff knew before trial that the defendant intended to raise the defense and did not contend that it would have offered additional evidence to oppose the defense if the motion had been made earlier). See also FED. R. CIV. P. 15(a)(2).

Moreover, "[a]lthough it is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver, there is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion." Brinkley, 180 F.3d at 608 (citations omitted). In Brinkley, the defendant had failed to raise the "factor-other-than-sex" defense in a gender discrimination case until it filed its summary

judgment motion. Id. at 612. Nevertheless, the court held that this time-lapse had not subjected the plaintiff to unfair prejudice:

> [The defendant] had raised and litigated this defense during the EEOC's consideration of the matter. Therefore, [the plaintiff] had fair warning that the defense was likely to arise again in the district court. Further, [the plaintiff] had ample opportunity to respond to [the defendant's] summary judgment motion in which it initially raised the "factor-other-than-sex" defense. As a result, we conclude that [the plaintiff] was not unfairly surprised or prejudiced by [the defendant's] delay in raising its affirmative defense.

Id. at 613.

The facts here are similar to those in Brinkley. Berglund's response to Alamjamili's EEOC charge, for example, includes the following paragraph:

> Finally, the Charging Party never made a complaint about the alleged discriminatory comments identified in his charge. The Respondent has an established anti-discrimination policy that would have effectively handled any such complaints. Regrettably, the Charging Party failed to make use of the Respondent's policy.

(Docket No. 77-1 at 7.) Given the advance notice that this language afforded to Alamjamili, as well as the courts' preference for resolution "on the merits," Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp., 843 F.2d 808, 811 (4th Cir. 1988), the court finds it appropriate in this case to permit Berglund to amend its answer to state an affirmative defense under Faragher and Ellerth.

Nevertheless, the court also deems it advisable to allow the parties to further plumb the availability and merits of this defense. Accordingly, discovery in this case will be reopened on this limited issue pursuant to a scheduling order to be entered by the court. Given that these additional steps must be taken as a result of Berglund's inadvertence, Berglund shall bear all

28

costs and attorney's fees incurred by Alamjamili as a result of its untimely request for leave to amend.

## V.  **Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Berglund will be denied in part and granted in part. Berglund's motion to amend its answer will be granted, Alamjamili's motion to strike the declaration of Anne Feazelle will be denied, and Berglund's motion to strike the affidavit of Alamjamili will be dismissed as moot.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This _18th_ day of April, 2011.

_____
Chief United States District Judge